## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| LAURA J. JONES. | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT FOR PERSONAL INJURY
## UNDER THE FEDERAL TORT CLAIMS ACT

For her complaint against the Defendant, the Plaintiff, Laura J. Jones, alleges as follows:

1. That at all pertinent times, Plaintiff is and was a citizen of the United States of America, and that Plaintiff currently resides in the state of Iowa.

2. That the acts and omissions complained of herein were performed by agents, servants and/or employees acting within the course and scope of their employment with the Defendant, thereby rendering the Defendant liable in damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80 *et seq*.

3. That the Plaintiff timely filed a claim pursuant to the requirements of the Federal Tort Claims Act (a copy of said claim has been attached hereto, marked as Exhibit A, and is incorporated by reference herein), and more than six months has elapsed since filing of said claim, thereby establishing jurisdiction in this honorable Court pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675.

4. That the acts and omissions complained of herein by the Defendant occurred within the state of North Carolina, thus rendering jurisdiction and venue proper within this honorable Court pursuant to 28 U.S.C. § 1402(b).

5. That at all times relevant hereto, the Defendant owned, controlled, and/or operated the military base located at and known as Camp Lejeune, North Carolina.

6. That at all times relevant hereto, the Defendant was responsible for doing whatever was necessary to provide a water supply that was uncontaminated and was otherwise safe for drinking, bathing, and for all other purposes for all occupants of Camp Lejeune and any other persons reasonably foreseen to use the aforementioned water supply for personal use, contact, and/or consumption.

7. That at all times relevant hereto, the Defendant was responsible for maintaining, inspecting, and otherwise providing that the property which it owned, controlled, and/or operated at Camp Lejeune did not have dangerous and/or hazardous contaminants or pollutants in the water supply or contaminants or pollutants that could leech into the water supply system that was expected to be used by human beings, regardless of the source of such contaminants or pollutants.

8. That at all times relevant hereto, Defendant was required to maintain and otherwise provide a water supply system that was in compliance, not only with due care, but also with any and all federal, state, and/or all applicable military regulations, orders, procedures, instructions or standards to ensure the health, safety and welfare of all individuals that were reasonably foreseeable to consume or become physically exposed to said water supply system.

9. Attached as Exhibit B and Exhibit C to this complaint are true copies of the Department of the Navy, Bureau of Medicine and Surgery, known as BUMED Instruction 6240.3B and BUMED Instruction 6240.3C, which at all pertinent times herein were in effect and required to be followed by the Defendant at various Navy bases and facilities, including Camp Lejeune.

10. The BUMEDs, Exhibits B and C, created and mandated a duty on the part of the command staff, agents, servants and employees of the Defendant at Camp Lejeune.

11. BUMED 6240.3B and C, Exhibits B and C, as applicable to various Naval bases, including Camp Lejeune, mandated that the water supply had to be adequate in capacity to meet maximum demands without creating health hazards, to be located, designed and constructed to eliminate or prevent contamination or pollution and to be conscientiously operated by well-trained and competent personnel whose qualifications were commensurate with the responsibilities of their positions.

12. The definition of a health hazard as mandated by BUMED 6240.3B and C, Exhibits B and C, means any condition, devices or practices in the water supply system and its operation, including structural defects, whether in the design, or construction, which create, or may create a danger to the health and well-being of the water consumer, which included all those persons reasonably expected to be drinking and bathing in the water at Camp Lejeune including the Plaintiff, Laura J. Jones.

13. BUMED 6240.3B and C, Exhibits B and C at all pertinent times mandated, among other things, that a health hazard was to be considered by employees, agents and servants of the Defendant to mean any defects in the location, design, or construction of the water supply system, which may regularly or occasionally prevent

satisfactory purification of the water supply or cause it to be polluted from extraneous sources, even if the physiological effects of the pollutants or contaminants were not known.

14. The said BUMEDs, Exhibits B and C, mandated and required the command staff, agents, servants and employees of the Defendant at Camp Lejeune to ensure that the water supply be obtained from the most desirable source feasible, that efforts be made to control contaminants or pollution of the source and that if the source were not protected adequately by natural means, that it be adequately protected by treatment.

15. The said BUMEDs, Exhibits B and C, mandated and regulated the command staff at Camp Lejeune to take affirmative steps to make frequent sanitary surveys to locate and identify health hazards which might exist in the water supply system.

16. The said BUMEDs, Exhibits B and C, mandated and regulated a duty to enforce rules and regulations to prevent the development of health hazards in the water supply system, to adequately protect the water quality throughout all parts of the system, as demonstrated by "frequent surveys", to see that there is a proper operation of the water supply under the "responsible" charge of personnel, to ensure adequate capacity to meet peak demands in the water supply without the development of health hazards, and to record the laboratory examinations to demonstrate consistent compliance with the water quality requirements of these standards.

17. Attached as Exhibit D is a Base Order effective at all pertinent times herein that commanded and directed command personnel, agents, servants and employees of the Defendant to cause periodic inspections to be made of contaminants and hazardous

materials in stock and to take steps to avoid improper practices of disposal that may contaminate, among other things, the drinking water at Camp Lejeune.

18. That at all pertinent times the Defendant, through its agents, servants and employees, acting within the course and scope of their employment, negligently, carelessly and recklessly failed to follow their mandate and failed to exercise due care by causing or allowing various pollutants and contaminants, such as tetrachloroethylene, trichloroethylene, dicloroethylene, vinyl chloride, and benzene to exist in the base water supply in quantities that Defendant knew or should have known were dangerous to the life, health and welfare of those to whom they were supplying the water, including the Plaintiff, Laura J. Jones.

19. That subsequent to Defendant knowing or having reason to know that said water supply was contaminated or polluted with potentially dangerous and/or hazardous chemicals, that Defendant had the duty to warn the consumer to whom it was supplying said water, even if the physiological effects were uncertain or unknown.

20. Attached as Exhibit E (best copy currently available to the plaintiff), is a true copy of the Defendant's report of a surveillance performed for the detection of trihalomethane in the water supply of Camp Lejeune. Trihalomethane is an expected by-product of the chlorination treatment of a water supply. This report alerted the base command that the water was so highly contaminated with other chemicals that the values of trihalomethanes could not even be determined but only estimated because of the presence of the pollution or contaminants.

21. Attached as Exhibit F is a true copy of the Defendant's report of January 1981 reporting to the base command at Camp Lejeune that the trihalomethanes could not

even be measured at all because of the presence of heavy organic chemicals and alerted the base command of the need to analyze for chlorinated organics, such as tetrachloroethylene, trichloroethylene, dicloroethylene, and vinyl chloride.

22. Attached as Exhibit G is a true copy of the Defendant's report, again alerting the base command at Camp Lejeune that the water supply was "highly contaminated with other chlorinated hydrocarbons (solvents)!" The Defendant, through its agents, servants and employees, acting with the course and scope of their employment, negligently, carelessly and recklessly failed to follow the mandated responsibilities, as well as those responsibilities required by due care, to conduct an investigation of the report by qualified personnel and to conduct frequent surveys, to enforce regulations, orders, procedures, instructions, and/or standards and to take all reasonable steps to make sure that the contaminants even from extraneous sources did not pose a potential danger to the health and well being of the persons expected to use that water, including the Plaintiff herein.

23. Attached as Exhibit H is a report of the Grainger Laboratories, an independent contractor hired by the Defendant, alerting the command staff at Camp Lejeune that when they tried to conduct the monthly test for trihalomethane (an expected by product of chlorination) they also were hampered by what was thought to be a chlorinated organic substance and that "[t]hese appeared to be at high levels and hence more important from a health standard than the total trihalomethane content."

24. As evidenced by at least Exhibits E, F, and G herein, the base command already knew for at least a year and a half before the Grainger report of the high concentrations of contaminants that presented a health hazard to the persons expected

to use the water supply, but carelessly, negligently, and recklessly failed to take the necessary steps to warn, examine, survey, protect and/or take reasonable steps to provide a safe water system to the consumer personnel at Camp Lejeune, including the Plaintiff herein.

25. The Command was advised, through said Grainger Report of August 10, 1982, that the source of the dangerous contamination and pollution was the well fields owned and operated by the Defendant.

26. At all times relevant, agents, servants, and/or employees of the Defendant, acting within the course and scope of their employment, in addition to allowing pollutants and contaminants into the water supply system from other sources, caused or permitted large quantities of chlorinated solvents and other contaminants to be dumped and disposed of within Camp Lejeune property surreptitiously and under the cover of darkness and under the guise of training exercises for firemen, in addition to negligently and recklessly permitting spills and drum disposal as well as solvent-disposal practices from off-base facilities, without providing notice or warnings to consumers that they were being exposed to the dangerous and/or potentially poisonous substances that the Defendant knew or should have known were leeching into the aforementioned water supply system.

27. At all times relevant, the Defendant knew or should have known that providing water with contaminants, including chlorinated solvents, regardless of the source, would likely cause a variety of health problems, including but not limited to cancers, liver and kidney damage, central nervous system disturbances in humans,

disfigurement, pain, suffering and possibly death to the people to whom Defendant provided said water system.

28. That in or about November 1979, the Defendant, through its Environmental Protection Agency published a Suggested No Adverse Reaction level for trichloroethylene of no more than 75 parts per billion in a water supply. A true copy is attached hereto as Exhibit I.

29. In or about or about April, 1980, the Defendant, through its Environmental Protection Agency, published a Suggested No Adverse Reaction Level for perchloroethylene (another name for Tetrachloroethylene) for long term exposure not to exceed 20 parts per billion in a water supply system. A true copy is attached hereto as Exhibit J.

30. The Defedant's Environmental Protection Agency's Suggested No Adverse Reaction Levels for perchloroethylene and trichloroethylene, regardless of whether they were "legally" binding, along with other publications, and mandates, procedures or standards, such as the said BUMEDs, Exhibits B and C, actively or constructively, put the base command on further notice that the exceedingly high levels of contaminants and pollution in the water supply system would likely and foreseeably cause harm to the people to whom they were supplying the subject water.

31. In fact, when the tap water was tested in or about May of 1982, the trichloroethylene level in the Hadnot Point area of Camp Lejeune was as high as 140 parts per billion (Exhibit H herein) and in July 1982 in Tarawa Terrace, a residential area of Camp Lejeune there were 104 parts per billion of tetrachloroethylene in the water supply.

8
Case 7:09-cv-00106-BO   Document 1   Filed 07/04/09   Page 8 of 14

32. When the testing was performed in or about February of 1985, the trichloroethylene in the water supply system was as high as 1148 parts per billion and, the dichloroethylene level as high as 406 parts per billion in the Berkley Manor Elementary School area of Camp Lejeune and the tetrachloroethylene was 215 ppb, with one well supplying the water to consumers at Camp Lejeune having 18,900 ppb of trichloroethylene, 400 parts per billion of perchloroethylene, 8,070 parts per billion of dichloroethylene and 655 parts per billion of vinyl chloride.

33. That at no time did the Defendant warn the individuals at the base or those coming onto the base that would be reasonably expected to use that water, that said water supply could and/or would potentially harm them and their families.

34. Attached as Exhibit I is a true copy of a Notice to Residents of Tarawa Terrace, an area of Camp Lejeune, that there was a problem "supplying enough water" because two wells were taken off the line because "minute (trace) amounts of several organic chemicals have been detected in the water."

35. The said Notice, Exhibit K, was in itself an act of negligence, carelessness, and recklessness on the part of the base command staff in that it affirmatively ignored a duty to warn the users of the subject water of exceedingly high levels of pollutants or contaminants while engendering detrimental reliance on the part of the consumers of the water by stating that the pollutants and contaminants existed only in "minute" or "trace" amounts when the command staff knew or should have known that the levels and nature of the pollutants and contaminants were so exceedingly high they could cause, among other illnesses, kidney and liver damage, damage to the central nervous

system, disfigurement in fetuses, cancer and other potential health problems and/or death.

36. That the Defendant's Agency for Toxic Substances and Disease Registry, a statutorily created agency, an operating division within the Department of Health and Human Services, at the direction and/or request of the Defendant's Department of Defense, revealed to the public that for a thirty year period, extending at least from 1957 through 1987, the level of chlorinated solvents exceeded Navy regulations, procedures or standards, instructions, and was at times hundreds, and sometimes thousands of times, greater than levels known by the Defendant to be the acceptable and safe levels for use by human beings.

37. That Defendant failed and/or refused to notify the people exposed to the contaminated water of their potentially dangerous exposures and the nature and extent of the potential health issues relating thereto and that even after the Defendant publicly revealed the extent of the levels of the said pollutants and contaminants as being present in the water at least from 1957 through 1987, exposing people at the base to exceedingly dangerous levels, it failed again to notify persons who may have been in contact with the subject water.

38. That the Defendant, through its agents, servants, and/or employees, acting within the course and scope of their employment, including but not limited to the National Center for Environmental Health at the Centers for Disease Control and Prevention through the Department of Health and Human Services, erroneously, negligently, carelessly and with reckless indifference continues to this day in efforts to instill confidence in those exposed to the pollutants and contaminants that there is either an

improbable or no causal link between the excessive contamination presented by chlorinated solvents and their illnesses, including, but not limited to cancers, liver and kidney damage, damage to the central nervous system, disfigurements, and even in some cases death.

39. That the Defendant, at all times pertinent, through the acts and omissions of their agents, servants and/or employees acting within the course and scope of its employment were negligent, reckless, careless and in violation of its standard of due care in at least the following ways:

    a. In failing to provide water that was fit for human contact and consumption;

    b. In dumping or permitting the dumping and disposal of large quantities of contaminants and pollutants on its property that would and did cause contamination of the water supply system;

    c. In failing to train personnel concerning practices of disposal of contaminants and pollutants and in monitoring and detecting the hazard;

    d. In failing to ensure that the subject water supply was obtained from the most desirable source feasible and in failing to make efforts to control contaminants or pollution at the source or, if not accomplished by natural means, to do so by treatment.

    e. In failing to make sure that no potential health hazard existed in said water supply, either from the location, design or construction of the system that could allow pollution from extraneous sources, even if the physiological effects were not known.

f. In failing to provide well-trained and competent personnel whose qualifications are commensurate with the responsibility of conscientiously operating the said water system so that it did not contain pollutants or contaminants.

g. In failing to conduct frequent surveys of the water, and whenever surveys or tests were made, failing to take steps to rectify the contamination and pollution that those tests revealed.

h. In failing to monitor and warn the inhabitants and other exposed persons at Camp Lejeune of the exposure to the exceedingly high levels of contaminant and other potential damage of exposure to the water supply;

i. In negligently, carelessly and indifferently continuing to not only warn and notify, but to instill a level of confidence in those persons exposed to these contaminants and pollution that there is no proven connection between their identifiable illnesses, disfigurements and deaths and the poisons that existed in the water supply;

j. In that even after the Defendant was specifically warned by its own agents and contractors that it was supplying contaminated or polluted water to the inhabitants of Camp Lejeune, it carelessly, recklessly and negligently failed to close down or correct the water supply for years thereafter without notice or warning to the people exposed;

k. In failing to clean properly the contaminated and polluted condition in a timely manner to prevent contamination of the aquifers and surrounding areas;

l. In that in addition to violating the standard of due care, the Defendant is negligent in violating applicable federal, state, and/or military regulations, orders, procedures or standards intended for the safety, health and welfare of the people located at Camp Lejeune; and

m. In continuing to the present day to instill a doubt in the minds of its victims by maintaining, insinuating or implying that there was no problem existing or if there was, that there is no causal link between the exposure to these contaminants and pollutants and their health problems.

40. The Plaintiff, Laura J. Jones, has been married to Kelly J. Jones, who served as a United States Marine until his honorable discharge in May of 1983, and she resided at Camp Lejeune from the spring of 1980 through May of 1983 during which time the water supplied to her for drinking and bathing by the Defendant was contaminated and polluted as described above.

41. As a direct and proximate cause of the exposure to said pollutants and contaminants, the Plaintiff developed a cancer, known as Non-Hodgkin's Lymphoma, that was diagnosed in November of 2003 and which has required her to undergo a course of chemotherapy from November 2003 to March 2004, resulting in a temporary remission, but with signs that the likelihood of a recurrence is increasing. She continues to suffer, among other problems, resulting fibromyalgia requiring high dosages of narcotics to address the pain, an adrenaline insufficiency, immune system difficulties requiring her to take high dosages of immunoglobulin and other medications to address these ongoing problems and suffers confusion and loss of memory as a result of chemotherapy.

42. The Plaintiff, Laura J. Jones, was born on November 19, 1961. She received a diploma and license in nursing, but can no longer work as a nurse because of the medical problems described above, and she is expected to suffer pain, fear and anxiety of a recurrence and dying of cancer, loss of mobility and enjoyment of life, loss of income and the ability to obtain gainful employment, and medical expenses, among other things, now and in the future.

WHEREFORE: the Plaintiff demands judgment against the Defendant in an amount that will fully compensate her for all the losses she has suffered and will suffer in the future as allowed by the applicable law and for costs, fees and other further relief that the Court may deem just and proper.

/s/ Joseph L. Anderson
Attorney for Plaintiff
ANDERSON PANGIA & ASSOC., PLLC
Washington, D.C. Office:
1717 N Street N.W.
Washington, D.C. 20036
Telephone: (800) 735-4062
Fax: (202) 955-9444
North Carolina Office:
2615 Sparkling Place
Winston Salem, NC 27103
Telephone: (800) 735-4062
Fax: (866) 489-2916
E-mail: janderson@andersonpangia.com
N.C. State Bar No. 19533